AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California





United States of America

v.

JOBSON MARANGONI DE CASTRO,
 aka "Jobs Marangoni,"
 aka "Brazil Jobs,"

                Defendant

Case No.     2:23-mj-04267-duty

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the dates of May 10, 2023 to May 18, 2023, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. § 2314 | Interstate Transportation of Stolen Property |

This criminal complaint is based on these facts:

 *Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/ Gary Wallace*
*Complainant's signature*

Gary Wallace, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   August 21, 2023

_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Alka Sagar, U.S. Magistrate Judge
*Printed name and title*

AUSA: Sarah S. Lee (x7407)

## **AFFIDAVIT**

I, Gary Wallace, being duly sworn, declare and state as follows:

### **I.   PURPOSE OF AFFIDAVIT**

1.   This affidavit is made in support of a criminal complaint against and arrest warrant for Jobson Marangoni DE CASTRO ("DE CASTRO"), for a violation of 18 U.S.C. § 2314: Interstate Transportation of Stolen Property ("Subject Offense").

2.   This affidavit is also made in support of an application for a warrant to search the person of DE CASTRO as described more fully in Attachment A.

3.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of the Subject Offense, as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates and times are on or about those indicated.

## II. <u>BACKGROUND OF SPECIAL AGENT GARY WALLACE</u>

5.    I am a Special Agent ("SA") with the FBI, and have been so employed since May 2017.  I am presently assigned to the Los Angeles Field Office, where I am responsible for investigating violent crimes, including bank robberies and burglaries, extortion, kidnappings, interstate transportation of stolen property, and other violations of federal statutes. As a Special Agent, I have received extensive training regarding federal criminal law. I completed 21 weeks of training at the FBI Academy located at Quantico, Virginia, where I received training in federal robbery and theft-related laws, identification and investigation of criminals, and various surveillance and investigative techniques related to violations of federal law. I regularly refer to these laws during the course of my duties and have written and participated in the execution of several state and federal search and arrest warrants in violation of these laws.

6.    During the course of my employment with the FBI, I have participated in investigations that employed various investigative techniques, including witness interviews, review of video surveillance, and collection of physical evidence. Through my training, experience, and interaction with other law enforcement officers, I am familiar with the methods employed by burglars to gain unlawful access to various locations in order to steal valuable possessions and then transport them for hiding or sale to third parties. I am also familiar with how criminals use digital devices to facilitate and conceal their crimes.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

7.    DE CASTRO stole over $1.8 million of jewelry, clothing, and accessories from Victims L.B.C.L. ("Victim 1") and L.C.L. ("Victim 2"), and then traveled to another state to sell the stolen goods.

8.    On May 10, 2023, the Victims were staying in a hotel in Beverly Hills to attend an event.  As discussed further below, substantial evidence -- including surveillance video footage -- shows DE CASTRO went to the Victims' hotel, tricked an employee into giving him a key to the Victims' room, and stole six suitcases from the Victims.  The suitcases were full of jewelry, clothing, and accessories, worth over $1.8 million.

9.    Approximately one week later, on May 18, 2023, DE CASTRO traveled to a jewelry store in Miami, Florida, and sold some of the stolen jewelry, claiming they belonged to his late mother.  DE CASTRO later received a wire of $50,000 for selling some of the stolen jewelry.  After he received the wire, he told the jewelry store, "I'm very happy."

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

10.    Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.    May 5, 2023: The Victims Travel to Beverly Hills, CA**

11.    On Friday, May 5, 2023, Victim 1 and Victim 2, residents of Brazil, traveled together to Beverly Hills, California.  The Victims visited Beverly Hills to attend a fashion event scheduled for May 9, 2023.  During their trip, the

Victims stayed at The Peninsula Beverly Hills hotel ("the PENINSULA HOTEL"), located at 9882 South Santa Monica Boulevard, Beverly Hills, CA 90212.  The Victims were the sole guests checked into Room 222 and were scheduled to check out on May 12, 2023.

12.  The Victims traveled with several suitcases, which contained their possessions including jewelry and designer fashion items.  The Victims placed several Apple AirTags inside of several of their suitcases.  During their trip, the Victims did not provide their hotel room number to anyone else.

**B.   May 9, 2023: DE CASTRO Dines At the Hotel Bar and Bills the Victims' Room**

13.  From my review of video surveillance footage from the PENINSULA HOTEL and conversations with law enforcement officers, I am aware of the following facts.

14.  On May 9, 2023, at approximately 6:34 p.m., DE CASTRO took an Uber to the PENINSULA HOTEL.  While at the hotel, DE CASTRO dined at the hotel bar.  After his meal, DE CASTRO fraudulently charged the bill to the Victims' room, by writing Room 222 and the names of Victim 1 and Victim 2 on the receipt.  At approximately 8:00 p.m., DE CASTRO left the hotel in another Uber.

15.  Based on information the Victims provided to law enforcement, the Victims do not know DE CASTRO and never gave him authority to use or sign their names or charge services to their room.

### C.   May 10, 2023: DE CASTRO Steals Six Suitcases from the Victims' Hotel Room

16.   From my review of video surveillance footage from the PENINSULA HOTEL, review of investigative reports, and conversations with law enforcement officers, I am aware of the following facts:

17.   On May 10, 2023, at approximately 5:55 p.m., DE CASTRO returned to the PENINSULA HOTEL in another Uber.  At approximately 6:07 p.m., DE CASTRO walked up to the front desk of the hotel and spoke with a front desk clerk.  DE CASTRO fraudulently claimed he was a guest staying in Room 222 and he had left his key and personal items in the room.  After asking security questions, which DE CASTRO was able to answer, the clerk gave DE CASTRO a key to Room 222.

18.   After obtaining the key, DE CASTRO walked to Room 222, knocked on the door, and used the door key to enter the room. When DE CASTRO entered the room, Victim 1 was not in the room but Victim 2 was asleep inside of the room.  DE CASTRO left the room after about 15 seconds and exited the second floor through the staircase.  At approximately 7:07 p.m., DE CASTRO left the hotel in another Uber.  At approximately 7:40 p.m., the Victims left their room for dinner.

19.   At approximately 8:16 p.m., DE CASTRO returned to the hotel in another Uber.  After walking around the hotel for a period of time, he walked upstairs to Room 222.  While in front of the door, he looked around and leaned towards the door.  He then opened the door and entered the room.  This time, neither

victim was inside.  Approximately one minute after DE CASTRO
entered the room, he began to roll suitcases out of the room
into the hallway until all six of the Victims' suitcases were
out of the room.  The six suitcases consisted of five dark
colored suitcases and one smaller silver suitcase.

20.  DE CASTRO rolled the suitcases into an empty elevator.
Inside of the elevator, DE CASTRO put his head down and appeared
to be looking at this phone.



21.  After the elevator doors opened on the first floor, an
unknown female who had been waiting for the elevator saw DE
CASTRO with the suitcases and helped him roll them out of the
elevator.  After DE CASTRO and all of the suitcases were out of
the elevator, she went inside the elevator.

22.  After leaving the elevator, DE CASTRO again looked at
his cell phone and then rolled two of the suitcases to the front
door and approached a hotel employee.  The hotel employee then

assisted DE CASTRO with moving all six suitcases outside to the valet area of the hotel.

23. Once outside with the suitcases, DE CASTRO directed the employee to another Uber that had driven into the valet area. The employee loaded all six suitcases into the rear cargo area of the Uber. DE CASTRO then entered the rear driver-side seat of the Uber and it drove away from the valet area.

24. Later that same evening, at approximately 9:30 p.m., the Victims returned to their hotel room. They discovered that all six of their suitcases, and all of their possessions inside of those suitcases, were missing. Victim 1 called the hotel front desk and reported the missing items. The hotel staff then contacted the BHPD and reported the alleged burglary and theft.

**D.   BHPD Responds to the Burglary Report**

25. BHPD Patrol Officers responded to the PENINSULA HOTEL and spoke with the Victims and hotel employees. The Victims reported that approximately $500,000 of jewelry (including necklaces, bracelets, earrings and rings) and approximately $300,000 of clothing and shoes were taken from their room. The Victims did not grant anyone permission to enter their room or take their belongings, and they did not know who committed the crime. The Victims were shown surveillance video footage from the hotel that showed DE CASTRO, but they did not recognize DE CASTRO.

26. The Victims conducted an inventory of their items and reported the following items as stolen, along with their initial estimated value:

      a.    Five black Tumi suitcases, worth $5,000;

      b.    One silver Rimowa carry-on bag, worth $1,000;

      c.    One Flavia Vetorasso diamond necklace, worth $200,000;

      d.    Miscellaneous jewelry, worth $300,000;

      e.    One white Chanel dress, embroidered silk Jacquard, worth $14,900;

      f.    Miscellaneous clothing and shoes, worth $285,100; and

      g.    Victim 1's Passport.

27.  The total initial estimated value of the Victims' stolen property was $806,000.

28.  The Victims' son, T.C.L., tracked the GPS location of the Apple AirTags that were in the suitcases and provided the GPS location information to the BHPD.  The location data showed the AirTags were in an area near South Rodeo Drive and Olympic Boulevard in Beverly Hills.  On May 11, 2023, BHPD officers located two AirTags on the north side of the property at 420 South Rodeo Drive, Beverly Hills, CA.

**E.  The Victims Provide Additional Information about the Stolen Items**

29.  On or about June 7, 2023, the Victims' attorney provided BHPD with a comprehensive inventory and appraisal for most of Victim 1's stolen jewelry.  The inventory and appraisal was completed by Flavia Vetorasso Sciarra (hereinafter "FVS"), an internationally acclaimed jewelry designer and expert of gemstones and diamonds.  The inventory listed nine items,

including a white gold multi-shape diamond necklace, with a total of 35.24 carat diamonds ("the DIAMOND NECKLACE").  The DIAMOND NECKLACE had an appraised value of $395,000. Additionally, the Victims' attorney provided an image of the DIAMOND NECKLACE and stated that it was a custom-made necklace. The total appraised value of all of the stolen FVS jewelry was $1,479,000.

30.  The Victims' attorney also provided BHPD with a Certificate of Origin and appraisal for another item of Victim 1's stolen jewelry that was not from FVS.  The certificate was completed by the Swiss luxury watch manufacturer, Chopard.  The certificate was for one white gold Chopard L'Heure du Diamant watch ("the WATCH").  The appraisal was completed by a Chopard retailer, and the watch had an appraised value of 81,200 euros (approximately $89,400).

31.  The Victims' attorney also informed BHPD that a later assessment of the Victims' stolen clothing items, which was initially estimated to be $300,000, was estimated at $270,215. Based on the appraisals and the updated estimates, the total calculated value of the stolen property, not including the suitcases themselves, was $1,838,615.

**F.   BHPD Investigates DE CASTRO's Uber Rides To and From the PENINSULA HOTEL**

32.  During the course of its investigation, the BHPD searched the CA Department of Motor Vehicles ("DMV") database for records of the different cars that drove DE CASTRO to and from the PENINSULA HOTEL on May 9, 2023 and May 10, 2023.

Through its investigation, BHPD determined that the cars were driven by Uber drivers.

33.  On May 24, 2023, the Honorable Stacy Wiese, Los Angeles Superior Court Judge, signed a state search warrant issued to Uber requesting electronic records and other information related to the investigation.  In response, Uber provided records for two rides, one on May 9, 2023 and one on May 10, 2023, both taken by DE CASTRO.  The Uber records for both rides included personal information of the customer, including the display name "Jobs Marangoni" and a profile photograph.

34.  Based on my review of the profile photograph, I believe it matches the appearance of DE CASTRO in the surveillance video footage from the PENINSULA HOTEL, though the Uber profile photograph appears to be an older photograph of DE CASTRO.

35.  The Uber records for the May 9, 2023 ride were consistent with the time that DE CASTRO was dropped off at the PENINSULA HOTEL the day before he stole the suitcases.  The records show a pick up time of 6:26 p.m., a drop off time of 6:34 p.m., and GPS coordinates for the pick up and drop off locations.  The GPS coordinates show that DE CASTRO was picked up in Beverly Hills on South Rodeo Drive, just south of Olympic Boulevard.  They also show that DE CASTRO was dropped off in front of the PENINSULA HOTEL.

36.  The Uber records for May 10, 2023 ride were consistent with the second time DE CASTRO was dropped off at the PENINSULA

HOTEL on that day to steal the suitcases.  The records show a
requested pick up time of 8:04 p.m. and GPS coordinates for the
rider's location at the time of the ride request and the actual
pick-up location.  The GPS coordinates show DE CASTRO was in
front of 401 South Rodeo Drive, Beverly Hills, CA at the time of
the request and DE CASTRO was dropped off in front of the
PENINSULA HOTEL.  The Uber records also show that at the drop-
off time of this ride, DE CASTRO's device had an IP address
associated with the Internet Service Provider "The Peninsula
Hotel."

     **G.   BHPD Identifies DE CASTRO**

    37.  After receiving the records from Uber, the BHPD
searched department databases for the name "Jobs Marangoni."
Through the search, the BHPD found a possible match of Jobson
Marangoni DE CASTRO.  The BHPD searched the CA DMV database for
DE CASTRO and obtained personal information of DE CASTRO,
including his DMV photograph and an address of 401 South Rodeo
Drive, Apartment B, Beverly Hills, CA 90212.  I have viewed DE
CASTRO's CA DMV photograph and believe it matches the appearance
of DE CASTRO in the surveillance footage from the PENINSULA
HOTEL.  Using open source databases, I investigated DE CASTRO's
CA DMV-listed address.  I learned that the address was in a
residential apartment complex just south of the cross street
Olympic Boulevard.

    38.  The address for DE CASTRO's pick-up location for his
Uber rides on May 9, 2023 and May 10, 2023 corresponded to DE
CASTRO's CA DMV-listed address.  Further, DE CASTRO's address is

across the street from the location where BHPD recovered two Apple Airtags that were in the Victims' luggage.

39.   Officers also learned through their investigation that DE CASTRO is a Brazilian citizen living in the United States as a legal permanent resident.

**H.   DE CASTRO Travels to Miami to Sell the DIAMOND NECKLACE and WATCH**

40.   Based on its investigation, BHPD identified and sought records for a phone number and Instagram profile associated with DE CASTRO.  Based on those records, I am aware of the following facts.

41.   On or about May 12, 2023, DE CASTRO traveled to the Miami area.  On May 17, 2023, at approximately 9:15 p.m. Eastern Time, DE CASTRO sent an Instagram message to Instagram user diamondbancaventura ("Diamond Banc").  In the message, DE CASTRO said he saw Diamond Banc's ad on Instagram and he wanted to sell a "40 ct" necklace.

42.   On May 18, 2023, at approximately 10:21 a.m. Eastern Time, Diamond Banc asked for images and paperwork.  In response, DE CASTRO sent photographs of a diamond necklace and watch.

//

//



43.   I have compared the photograph of the diamond necklace
sent by DE CASTRO with the photograph of the DIAMOND NECKLACE
provided by Victims' attorney to the BHPD, and they appear to be
the same.   I have compared the photograph of the diamond watch
sent by DE CASTRO with the photograph of the WATCH provided by
Victims' attorney to the BHPD, and they also appear to be the
same.

44.   DE CASTRO also told Diamond Banc that he was in South
Beach, that he wanted to sell the jewelry, and that he did not
have papers because his mother passed away and he had found the
necklace and watch in her safe box.   DE CASTRO also said that
the necklace was "40 ct" and he was hoping for "100k."   Diamond
Banc responded with instructions to come to the business for an
inspection and said they would have to inspect the stones at the
business in order to provide an accurate quote.

45.  The same day, at approximated 10:47 a.m. Eastern Time, DE CASTRO said he could leave for Diamond Banc now and would arrive in about one hour.  He also asked whether Diamond Banc pays by cash or by Zelle, and Diamond Banc responded that payment would be made by wire transfer or check.  Diamond Banc also said the wire could hit the same day if DE CASTRO came by 2 p.m.

46.  At approximately 11:47 a.m. Eastern Time, DE CASTRO sent a screenshot of an Uber ride, which showed he was heading to Diamond Banc Aventura's location, and the expected drop off time was 12:21 p.m. Eastern Time.  DE CASTRO also provided his name as Jobs Marangoni.  Later that same day, May 18, 2023, Diamond Banc wired DE CASTRO $50,000.

47.  On the following day, May 19, 2023, Diamond Banc sent DE CASTRO an Instagram message asking, "Did you get the wire?" DE CASTRO responded, "Good morning. I did. Thank you so much. I will definitely recommend. I'm very happy."

**I.    BHPD Discovers DE CASTRO is a Suspect in a Related Theft at the Beverly Wilshire Hotel**

48.  During the course of its investigation, BHPD learned DE CASTRO was the subject of another burglary and theft investigation, which had occurred at the Beverly Wilshire Hotel ("the BEVERLY WILSHIRE").  The BEVERLY WILSHIRE is a hotel located at 9500 Wilshire Boulevard, Beverly Hills, CA 90212.

49.  I learned the following facts from investigative reports of the burglary and theft at the BEVERLY WILSHIRE.  On Thursday, April 27, 2023, a male with initials D.F. and his wife

with initials O.F. were guests at the BEVERLY WILSHIRE, where they were checked in as the sole guests in Room 589. During their stay, D.F. and O.F. visited the hotel pool and met a man later identified as DE CASTRO.

50.   On April 28, 2023, at approximately 12:00 p.m., D.F. saw DE CASTRO again at the hotel pool.  D.F. started a conversation with DE CASTRO and introduced himself.  DE CASTRO introduced himself as "Brazil Jobs" from Brazil.  During their conversation, D.F. and DE CASTRO exchanged phone numbers and Instagram profiles.  D.F. also informed DE CASTRO that he was staying in Room 589.

51.   Later that day, at approximately 6:36 p.m., DE CASTRO asked D.F. about his plans for the night.  D.F. replied that he had dinner reservations at 7:30 p.m. at a restaurant at a different hotel in Los Angeles, California.  DE CASTRO told D.F. that he also had dinner reservations for 8:30 p.m. at the same restaurant.  DE CASTRO advised D.F. not to wear his jewelry at the restaurant and that his jewelry would be safe at the hotel. D.F. thought this advice was odd because he believed the restaurant to be a safe location to wear jewelry, and wondered why "Brazil Jobs" would be concerned about D.F.'s jewelry.

52.   At approximately 7:05 p.m., D.F. and O.F. left their hotel for dinner.  Inside the hotel room safe, they locked their passports, O.F.'s U.S. Visa, jewelry, and cash.  Additionally, D.F. and O.F. had some of their clothing and other belongings in the closet, while the remainder of their clothing and other belongings where in several bags inside of the room.

53.   Based on surveillance video footage from the BEVERLY
WILSHIRE, I am aware of the following facts.  At approximately
6:32 p.m., DE CASTRO was at the front desk obtaining a key to
D.F. and O.F's hotel room.  At approximately 7:33 p.m., DE
CASTRO, stood in the hotel lobby area and then left the lobby
area.  At approximately 8:00 p.m., DE CASTRO walked back through
the hotel lobby carrying luggage belonging to D.F. and O.F.

54.   I have compared the surveillance images from the
BEVERLY WILSHIRE with the surveillance images from the PENINSULA
HOTEL and DE CASTRO's CA DMV photograph, and the photographs of
DE CASTRO appear to match.

55.   Later that same evening on April 28, 2023, D.F. and
O.F. returned to the BEVERLY WILSHIRE.  Upon entering their
hotel room, they discovered that both the closet and safe were
opened and empty, and all of their belongings in the closet and
safe were missing from the room, along with multiple bags of
their clothing and possessions.  All of the items were presumed
to be stolen and D.F. notified hotel staff, who notified the
BHPD.

56.   D.F. and O.F. conducted an inventory of the stolen
items which included approximately $36,000 of jewelry, designer
clothing, suitcases, their passports, O.F.'s U.S. Visa, and
$3,000 in cash.

57.   D.F. believed that DE CASTRO, who had introduced
himself as "Brazil Jobs," may have committed the burglary.  D.F.
described DE CASTRO and provided the BHPD with a cell phone

picture that he took at the BEVERLY WILSHIRE pool which showed the back of "Brazil Jobs" in the background.

58.  On July 6, 2023, law enforcement conducted a photographic line-up with D.F.  The line-up included DE CASTRO's CA DMV photograph.  D.F. positively identified DE CASTRO as the person whom he met at the BEVERLY WILSHIRE pool that went by the name "Brazil Jobs."

### V.  <u>TRAINING AND EXPERIENCE REGARDING THEFT CRIMES</u>

59.  Based on my training and experience and information obtained from other law enforcement officers who investigate theft offenses, I know the following:

a.  It is common practice for individuals involved in theft and fraud crimes to possess and use multiple digital devices at once.  Such digital devices are often used to facilitate, conduct, and track fraudulent transactions and theft.  Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet.  They often employ digital devices for the purposes, among others, of: (1) keeping records of their crimes; (2) researching victims; (3) researching the value of stolen goods; and (4) researching ways to sell stolen goods.

b.  Oftentimes perpetrators of theft and fraud offenses take pictures of stolen goods and victims with their cellphones.

c.  It is also common for perpetrators of theft and fraud offenses to keep "profiles" of victims on digital devices.

17

Such "profiles" contain the personal identifying information of victims, such as names, Social Security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers.  Perpetrators of theft and fraud offenses often keep such information in their cars, storage units, and in their digital devices.

       d.   Based on my training and experience, I know that individuals who participate in theft and fraud offenses often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business.  Oftentimes, they do so on their digital devices.  Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos.  Suspects may also have paper copies of such records, which they may keep on their person or in their cars, homes, or storage units.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[1]

    60.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

---

[1] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

  a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

  b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

61.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

62.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an

enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

63.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress DE CASTRO's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of DE CASTRO's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

64.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII. <u>REQUEST FOR NIGHTTIME SEARCH</u>

65.  DE CASTRO is expected to take a flight from London to Los Angeles on August 21, 2023, and is expected to land at Los Angeles International Airport (LAX) at 10:10 p.m., Pacific Time. It is likely that DE CASTRO will attempt to destroy evidence or flee if he becomes aware of this search warrant and Complaint after he lands.  As a result, I request a warrant authorizing a nighttime search so law enforcement officers can search DE CASTRO shortly after he lands at LAX at 10:10 p.m.

//

//

## VIII.    <u>CONCLUSION</u>

66.   For all the reasons described above, there is probable cause to believe that Jobson Marangoni DE CASTRO has committed a violation of 18 U.S.C. § 2314: Interstate Transportation of Stolen Property.

67.   Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offense will be found on DE CASTRO, as described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 21st day of
August 2023.


_____
HONORABLE ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE